50 A.3d 1112

**Matthew C. BAKER, et al.**

v.

**MONTGOMERY COUNTY, MARYLAND, et al.**

**No. 124, Sept. Term, 2011.**

Court of Appeals of Maryland.

Aug. 21, 2012.

692

694

Stephen H. Ring, Stephen H. Ring, P.C., Gaithersburg, MD (Toby N. Byrd, Timothy P. Leahy, and Joshua Winger of Byrd & Byrd, LLC, Bowie, MD; William F. Askinazi of Law Offices of William F. Askinazi, P.C., Germantown, MD), on brief, for Petitioners.

Kevin Karpinski (Sandra D. Lee of Karpinski, Colaresi & Karp, Baltimore, MD), on brief, for Respondents.

Charles L. Frederick, Associate Co. Atty. (Marc P. Hansen, Co. Atty., and Patricia P. Via, Division Chief, Office of County Attorney, Rockville, MD), for Respondents.

Argued before BELL, C.J., HARRELL, BATTAGLIA, GREENE, ADKINS, BARBERA, and McDONALD, JJ.

HARRELL, J.

It seems that speed cameras are a particularly unpopular law enforcement tool, having provoked some Marylanders to vandalism. *See* Erin Cox, *Speed Cameras v. Vandals,* Balt. Sun, 28 June 2012, at A1. Angry drivers are reported to have set fire to, hurled rocks at, and slingshot marbles at the cameras. In perhaps the most extreme example of retribution, we are informed that a man approached a car-mounted speed camera along the Baltimore–Washington Parkway, brandishing a shotgun and a hammer. He smashed two of the car's windows with the hammer before fleeing the scene (the occupant of the car was unhurt).

Not deterred, the local governments of Montgomery County, the Mayor and Council of Rockville, the City of Gaithersburg, and Chevy Chase Village (referred to collectively as Respondents) established speed cameras—defined technically as "speed monitoring systems." These systems recorded,

among many others, Petitioners [1] traveling in their vehicles at least ten miles per hour over the posted speed limit on various stretches of road within those jurisdictions. Respondents issued to Petitioners citations, each carrying a maximum civil penalty of $40. Petitioners, leaning somewhat more to pacifism than the folks in the above news accounts, sought a less violent resolution of their grievances with the cameras by filing, after paying the penalties, a complaint in the Circuit Court for Montgomery County. Counts I–VII of Petitioners' ultimate complaint asserted claims sounding in tort. Counts VIII and IX sought declaratory and injunctive relief. Petitioners asserted that Respondents' contracts with their common speed monitoring system contractor, ACS State and Local Solutions, Inc. ("ACS"), violated Maryland Code (1977, 2009 Repl.Vol.), Transportation Article, § 21–809(j).[2] Section 21–809(j), in order to discourage abuse by contractors, prohibits "Montgomery County" from remunerating, on a per-citation basis, a contractor who "operates" a speed monitoring system on the county's behalf. The Circuit Court concluded that Respondents, and not ACS, operated their speed monitoring systems (within the meaning of the statute) and, regardless, § 21–809(j) applied to Montgomery County only, i.e., not the municipalities. The court opined further that, even if it were accurate to state that ACS operated the relevant speed monitoring systems, the statute does not envision a private cause of action to support Petitioners' tort-based claims. In any event, the trial court held that Petitioners waived their ability to maintain their complaint by paying voluntarily the citation penalties. Accordingly, the court granted Respondents' motions for summary judgment on all counts.

Petitioners appealed to the Court of Special Appeals. The intermediate appellate court affirmed, agreeing with the Cir-

---

1. The petitioners are Matthew Charles Baker, Johnny Ray Garza, Aristone Luiz Pereira Jr., Janet Marburger, Walter McKee, David Alfred Schiller, Kenneth King Sleeman, and Thomas Jeffrey Wheatley.

2. This case involves speed camera citations issued in 2007 and 2008. Therefore, all references to Transportation Article, § 21–809 shall be to the version of the law in existence in 2007 and 2008.

cuit Court that § 21–809 does not contain an express or implied private cause of action to support the maintenance of Petitioners' tort claims. The Court of Special Appeals declared moot the declaratory and injunctive relief claims because Respondents amended their contract with ACS to state specifically their understanding that the governments operate the speed monitoring systems. Petitioners secured a writ of certiorari from this Court to review the judgment of the Court of Special Appeals.

We shall affirm the judgment of the intermediate appellate court, although not for all the same reasons it offered. As an initial matter, Petitioners, although arguing so in their brief, failed to question in their petition for writ of certiorari whether § 21–809(j) applies to all Respondents, not merely the local government of Montgomery County. Therefore, we shall not address it.[3] Md. Rule 8–131(b). We find no merit in Respondents' argument that Petitioners waived their ability to maintain the present litigation by paying voluntarily their speed monitoring system fines. Whether Petitioners were speeding at the time of their citation and whether Respondents' contracts with ACS violated § 21–809(j) are distinct and separate issues. Moreover, Maryland's permissive counterclaim rule of procedure does not preclude Petitioners from filing the present lawsuit, if actionable, after paying the fines.

Petitioners' momentum in this case ends there, however. Section 21–809 does not provide an express or implied private cause of action in tort, for the following reasons. First, § 21–809 is a general welfare statute that does not benefit a particular class of persons, let alone Petitioners. Second, the statute provides a remedy in the District Court for challenging speed monitoring system citations. These factors, combined with the lack of supporting legislative history endorsing an implied private right of action, establish that § 21–809 does

---

**3.** For the same reasons, Petitioners did not preserve for our review the Circuit Court's conclusion that the Local Government Tort Claims Act notice provisions, Md.Code (1973, 2006 Repl.Vol.), Courts and Judicial Proceedings Article, § 5–304(b), apply to their claims.

not create a private cause of action. With regard to Petitioners' injunctive and declaratory relief claims, Petitioners concede that they lack the necessary taxpayer standing to pursue those claims, in the event we did not find a private cause of action in the statutory scheme. Accordingly, we shall not address their argument that the local governments' contracts with ACS violate § 21–809(j).

## I. FACTUAL BACKGROUND

On 25 January 2006, the Maryland General Assembly, overriding then-Governor Ehrlich's veto, enacted House Bill 443 (2005), which was codified as Transportation Article, § 21–809. 2006 Md. Laws 15. The statute took effect on 24 February 2006. Section 21–809 authorized the use of speed monitoring systems on certain highways in school zones and residential districts in Montgomery County. Transp. Art., § 21–809(b)(i). The statute defines a "speed monitoring system" as "a device with one or more motor vehicle sensors producing recorded images of motor vehicles traveling at speeds at least ten miles per hour above the posted speed limit." Transp. Art., § 21–809(a)(5). When a speed monitoring system detects an offending motor vehicle, it is supposed to create a "recorded image" [4] of the rear of the motor vehicle, two time-stamped images showing a stationary object near the motor vehicle, and at least one clear and legible identification of the motor vehicle's entire license plate. Transp. Art., § 21–809(a)(4)(ii).

The "local police department" [5] issues and mails to the "owner" [6] a citation for the speeding offense, which carries a

---

4. " 'Recorded image' means an image recorded by a speed monitoring system: (i) On: 1. A photograph; 2. A microphotograph; 3. An electronic image; 4. Videotape; or 5. Any other medium...." Md.Code (1977, 2009 Repl.Vol.), Transp. Art., § 21–809(a)(4).

5. " 'Local police department' means: (i) The Montgomery County Department of Police; and (ii) The police department of any municipal corporation in Montgomery County." Transp. Art., § 21–809(a)(2).

6. " 'Owner' means the registered owner of a motor vehicle or a lessee of a motor vehicle under a lease of 6 months or more. 'Owner' does

civil penalty not exceeding $40. Transp. Art., § 21–809(c), (d). A citation recipient may pay the civil penalty or may elect to contest the citation at a District Court trial. Transp. Art., § 21–809(d)(5). The latter option must be printed on the citation. Md.Code (1973, 2006 Repl.Vol.), Cts. & Jud. Proc. Art., § 7–302(e)(1). An owner is not subject to a civil penalty if a police officer issued to him/her a citation at the time of the moving violation or if an owner defends successfully against the citation in a District Court trial. Transp. Art., § 21–809(c)(1), (f)(1) & (f)(4).

If a citation recipient elects a trial in the District Court, the local government must prove, by a preponderance of the evidence, that the citation recipient violated the speed limit. Transp. Art., § 21–809(e)(3). The government must submit in evidence a certificate alleging the citation recipient violated the speed limit; a certificate of training, issued to the "speed monitoring system operator" [7] upon completion of training; a daily log showing that the speed monitoring system operator performed successfully a self-test prior to producing a record-ed image; and, a signed certificate of calibration, issued annually by an independent calibration laboratory. Transp. Art., § 21–809(b)(2)–(4), (e)(1). A citation recipient may de-mand the speed monitoring system operator be present at trial to testify. Transp. Art., § 21–809(e)(2). Moreover, the statute permits a citation recipient to argue in his or her defense that the vehicle or its registration plates were stolen before the violation occurred; he or she was not operating the recorded vehicle at the time of the violation; or, any other issues or evidence that the District Court deems pertinent. Transp. Art., § 21–809(f)(1)(i)–(iii).

The gravamen of Petitioners' complaint centered on Trans-portation Article § 21–809(j), which provides, "If a contractor

---

not include: 1. A motor vehicle rental or leasing company; or 2. A holder of a special registration plate issued under Title 13, Subtitle 9, Part III of this article." Transp. Art., § 21–809(a)(3).

**7.** " 'Speed monitoring system operator' means an individual who oper-ates a speed monitoring system." Transp. Art., § 21–809(a)(6).

operates a speed monitoring system on behalf of Montgomery County, the contractor's fee may not be contingent on the number of citations issued or paid." Transp. Art., § 21–809(j). On or about 9 February 2007, Montgomery County contracted with ACS to "provide for the implementation, use, and servicing of photo speed enforcement technology and services as requested by [Montgomery] County." The Montgomery County—ACS contract specifies that ACS will "provide, install, and support all traffic camera equipment" and "supply an automated violation services solution." Under the section titled "Compensation," the Montgomery County—ACS contract states that ACS shall be compensated "at a rate of $16.25 per paid citation or $18,000 per month [for the duration] of the program, whichever is greater." Between 21 February 2007 and 23 May 2007, the municipalities entered separately into similar contracts with ACS. These contracts incorporate by reference the Montgomery County–ACS contract. The municipalities-ACS contracts provide similar compensation formulae also: that ACS will be compensated at a rate of $16.25 per paid citation or $2,999 per month for the duration of the program, whichever is greater (Chevy Chase Village contracted for $16.25 per paid citation or $6,000 per month of the program).

Respondents issued speed monitoring system citations to Petitioners for speeding violations that occurred during 2007 and 2008. The Chevy Chase Village Police Department issued a citation to Janet Marburger for a violation occurring on 23 February 2008 and two citations to Matthew Charles Baker for violations occurring on 9 July 2008. The Rockville City Police Department issued a citation to Johnny Ray Garza for violations occurring on 11 and 13 November 2007, to Thomas Jeffrey Wheatley for a violation occurring on 19 July 2008, to Kenneth King Sleeman for violations occurring on 17 August 2008 and 29 September 2008, and to David Alfred Schiller for a violation occurring on 4 September 2008. The Gaithersburg Police Department issued a citation to Walter McKee for a violation occurring on 19 August 2008. The Montgomery County Department of Police issued a citation to Garza for a

violation occurring on 24 November 2007, to Sleeman for a violation occurring on 10 February 2008, to Aristone Luiz Pereira Jr. for violations occurring on 4 and 8 April 2008, and to Schiller for a violation occurring on 25 June 2008. Petitioners paid voluntarily the civil penalty associated with each of their citations; thus no District Court trials were conducted.

Between September 2008 and June 2009, prior to the final disposition of Petitioners' claims in this litigation in the Circuit Court, Respondents amended their contracts with ACS. The amendments stated that ACS provides speed monitoring system equipment only, and that Respondents are solely responsible for the operation of their respective systems. Chevy Chase Village and ACS amended further their contract to change the compensation formula to a flat rate per month, i.e., compensation was not keyed to the number of successful citations issued.

## II. PROCEDURAL HISTORY

On 2 May 2008, Timothy P. Leahy, on his behalf and others situated similarly, filed a complaint in the Circuit Court for Montgomery County. Leahy named the City of Rockville, Montgomery County, and the Town of Chevy Chase (not to be confused with the distinct municipality of Chevy Chase Village) as defendants. He alleged that the defendants' contracts with ACS violated Transportation Article § 21–809(j) by compensating ACS on a per-citation-paid basis. Leahy demanded a jury trial and $20 million in damages for the economic loss suffered by himself and others situated similarly for having paid "unlawful" fines. On 16 May 2008, Leahy filed an amended complaint, adding the City of Gaithersburg as a defendant. Leahy followed with a motion to certify the class of plaintiffs.

Between 21 April 2008 and 21 July 2008, Rockville, Montgomery County, the Town of Chevy Chase, and Gaithersburg filed motions in opposition to class certification. Rockville, Montgomery County, and Gaithersburg filed also motions to dismiss. Additionally, Gaithersburg and the Town of Chevy

Chase filed motions for summary judgment. On 30 July 2008, the Circuit Court granted the Town of Chevy Chase's motion for summary judgment. After a hearing on 26 August 2008, the Circuit Court granted the remaining defendants' motions, dismissing with prejudice Leahy's claims against them, and denied Leahy's motion for class certification, without prejudice.

On 6 October 2008, Petitioners [8] filed, on their behalf and others situated similarly, a second amended complaint against Montgomery County, Rockville, Gaithersburg, and Chevy Chase Village. The second complaint contained nine counts, entitled: violation of the Maryland Declaration of Rights, unjust enrichment, conversion, constructive trust, civil conspiracy, breach of fiduciary duty, constructive fraud, temporary restraining order and preliminary and permanent injunctive relief, and declaratory relief. Montgomery County and Rockville answered. Gaithersburg and Chevy Chase Village filed a motion to dismiss or for summary judgment, which Petitioners opposed. After conducting a hearing on 12 February 2009, the Circuit Court denied Gaithersburg and Chevy Chase Village's motion, but permitted them to renew or file a new motion for summary judgment after completion of discovery. Gaithersburg and Chevy Chase Village filed an answer to the second amended complaint on 16 March 2009.

Petitioners filed a third (and final) amended complaint against Respondents on 7 October 2009. The third amended complaint contained the same nine counts as the second amended complaint. Petitioners alleged that ACS operated the subject speed monitoring systems for Respondents and that Respondents compensated ACS on a per-citation basis. As such, Petitioners urged that the contracts between ACS and Respondents were in contravention of § 21–809(j) and therefore were ultra vires, rendering all of the previously

---

**8.** Timothy Leahy and Michael Brody named Petitioners as additional plaintiffs in their second amended complaint; however, Leahy and Brody are not parties to this appeal. They dismissed voluntarily their claims on 19 June 2009 and 28 September 2009. Upon those dismissals, Baker became the lead plaintiff.

issued speed monitoring system citations invalid. Petitioners asked that Respondents refund the collected civil penalties stemming from the speed monitoring system violations, with interest. Respondents opposed Petitioners third amended complaint by filing, between 27 October 2009 and 2 April 2010, motions to strike and motions to dismiss or for summary judgment.[9]

The Circuit Court granted Respondents' motions for dismissal and/or summary judgment at a 15 July 2010 hearing, issuing a written order to that effect on 3 November 2010. First, the Circuit Court concluded that § 21–809(j) applied to Montgomery County only. Second, the court found, based on undisputed material facts as pleaded, that Respondents operated the speed monitoring systems.[10] Section 21–809 requires a speed monitoring system operator to maintain diagnostic logs and to submit them into evidence at contested trials of citations. Respondents' employees performed these tasks, and thus, *a fortiori*, Respondents operate their speed monitoring systems. Moreover, Respondents did not delegate final decision-making authority to ACS to determine whether any particular recorded image constituted a violation of § 21–809 that should be pursued by citation, reserving that authority for themselves.

---

**9.** Prior to filing their third amended complaint, Petitioners filed a new motion for class certification on 17 July 2009, which Respondents opposed. In an order, dated 23 March 2010, the Circuit Court granted Petitioners' motion for class certification as to their injunctive and declaratory relief claims only, except that it denied class certification as to all counts pleaded against Chevy Chase Village. Later, on 1 April 2010, Petitioners filed a motion for partial summary judgment, asking the Circuit Court to rule that ACS is a "speed monitoring system operator," within the meaning of Transportation Article § 21–809(a). Respondents opposed Petitioners' motion.

**10.** Previously, the Attorney General of Maryland, Office of Counsel to the General Assembly, concluded also, in a letter of advice to a member of the House of Delegates, from Montgomery County, that Montgomery County "operates" its speed monitoring system. Letter from Dan Friedman, Esquire, Counsel to the General Assembly, Attorney General of Maryland, to the Hon. Brian J. Feldman, Maryland House of Delegates (5 March 2008).

The Circuit Court opined further, in the alternative, that even if ACS were deemed to be the operator of the subject speed monitoring systems within the meaning of the statute, § 21–809 did not create a private cause of action for Petitioners to sue for an alleged violation of subsection (f) of the statute. Even if a private cause of action was authorized, the court concluded, Petitioners waived the right to sue separately on this ground after they paid voluntarily the civil penalties. On these additional bases, the Circuit Court granted Respondents' motion for summary judgment as to Petitioners' seven claims sounding in tort.[11]

Petitioners filed timely an appeal to the Court of Special Appeals, which, in a reported opinion, affirmed the Circuit Court. *Baker v. Montgomery Cnty.*, 201 Md.App. 642, 30 A.3d 267 (2011). The three-judge panel of the Court of Special Appeals addressed, as a threshold issue, whether a private cause of action exists. It noted that Transportation Article § 21–809 does not provide expressly for a private cause of action. *Baker*, 201 Md.App. at 670, 30 A.3d at 284. The panel then analyzed whether the statute created implicitly a private cause of action, relying on the applicable analysis discussed in *Erie Insurance Company v. Chops*, 322 Md. 79, 585 A.2d 232 (1991). The *Erie* factors, it concluded, militated against finding an implicit private cause of action in the statute because § 21–809 provides a District Court remedy. *Baker*, 201 Md.App. at 670–79, 30 A.3d at 284–89. Moreover, because Petitioners are not in a particular class of persons intended to benefit specially from the statute, finding an implicit private cause of action would be inconsistent with the purpose of the statute. *Id.* Thus, the Court of Special Appeals concluded that Petitioners' seven claims sounding in tort were not actionable. *Baker*, 201 Md.App. at 679, 30 A.3d at 289. The panel concluded that the remaining claims for injunctive and declaratory relief were moot, in light of the September

---

11. The Circuit Court concluded also that several Petitioners failed to comply with the Maryland Local Government Torts Claim Act by failing to give proper notice of their claims. Petitioners did not preserve properly this issue for review by this Court.

2008–June 2009 amendments to the Respondents—ACS contracts. *Baker,* 201 Md.App. at 680–81, 30 A.3d at 290.

Petitioners filed a petition for writ of certiorari with this Court, which we granted on 16 March 2012. *Baker v. Montgomery Cnty.,* 425 Md. 227, 40 A.3d 39 (2012). Petitioners presented three questions for our review: whether Petitioners' payment of the speed monitoring system fine waived their subsequent ability to mount their challenge to the ACS contracts under Transportation Article § 21–809(j); whether Transportation Article § 21–809 provides a private cause of action; and, whether the amendments to the Respondents—ACS contracts mooted Petitioners' injunctive relief and declaratory judgment claims.[12]

### III. STANDARD OF REVIEW

 Under Maryland Rule 2–501, the grant of a motion for summary judgment is appropriate only "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2–501(f). The parties here agree that there are no genuine disputes of material fact generated on the record before the Circuit Court. Thus, as was said in *Breslin v. Powell,* "This case presents a question of statutory interpretation, and therefore, we review the trial court's disposition through summary judgment under a non-deferential standard of review." 421

---

12. Petitioners, in their petition for writ of certiorari, framed the questions presented as follows:

A. Did the [Court of Special Appeals] err in ruling that any challenge by recipients of speed camera citations, no matter how complex, must be raised in Maryland District Court during the defense of a trial on a speed camera citation?

B. Did the [Court of Special Appeals] err in ruling that the recipient of a speed camera citation waives all challenges to a speed camera citation by paying the fine?

C. Is the [Court of Special Appeal's] ruling that the amendment, during this litigation and after the Plaintiffs citations were processed, of all four government contracts with the prime contractor, to recite that the contractor "does not operate" the speed monitoring, render the term, "operator" not applicable to the contractor, erroneous?

Md. 266, 277, 26 A.3d 878, 885 (2011) (citing *Walter v. Gunter*, 367 Md. 386, 392, 788 A.2d 609, 612 (2002)). We determine whether the trial court's decision was correct as a matter of law. *Id.* (quoting *Wash. Suburban Sanitary Comm'n v. Phillips*, 413 Md. 606, 618, 994 A.2d 411, 419 (2010)). Our review of the trial court's grant of summary judgment is limited ordinarily to the legal grounds relied upon explicitly in its disposition. *River Walk Apartments, LLC v. Twigg*, 396 Md. 527, 542, 914 A.2d 770, 778–79 (2007) (quoting *Standard Fire Ins. Co. v. Berrett*, 395 Md. 439, 450–51, 910 A.2d 1072, 1080 (2006)). Moreover, when construing a statute, we must

> "discern the legislative purpose, the ends to be accomplished, or the evils to be remedied...." We approach the statutory interpretation process by looking first at the plain language of a statute, giving the words their natural and ordinary meaning. If the language is clear and unambiguous on its face, our inquiry ends ordinarily. If, however, the language is ambiguous, we move on to examine the "legislative history, case law, statutory purpose, as well as the structure of the statute" to aid us in ascertaining the intent of the Legislature. When focusing on the relevant part of a statutory scheme, we attempt to harmonize the part with the whole, considering the "purpose, aim, or policy of the enacting body." When interpreting an ambiguous statute, we must reject any construction that would be illogical or nonsensical.

*Davis v. State*, 426 Md. 211, 218–19, 43 A.3d 1044, 1048 (2012) (internal citations omitted).

## IV. DISCUSSION

### A. *Petitioners' Ability To Maintain the Present Action Against Respondents After Paying Speed Monitoring System Penalties Without Protest*

■ We conclude that, by paying the speed monitoring system penalties for issued citations, Petitioners did not waive their right to pursue subsequently a claim against Respondents for violating Transportation Article § 21–809(j), if such a

claim is otherwise actionable. Respondents urge to the contrary, arguing that principles of res judicata prevent Petitioners from doing so and that, instead of paying simply the civil penalties, Petitioners should have elected to stand trial in the District Court and raised the claimed violation of § 21–809(j) as a counterclaim or defense in those proceedings.

■ Maryland's permissive counterclaim rule of procedure, Maryland Rule § 2–331(a),[13] enables Petitioners to raise such a potential counterclaim as a separate action. "[W]here the same facts may be asserted as either a defense or a counterclaim, and the issue raised by the defense is not litigated and determined so as to be precluded by collateral estoppel, the defendant in the previous action is not barred by res judicata from subsequently maintaining an action on the counterclaim." *Rowland v. Harrison,* 320 Md. 223, 235–36, 577 A.2d 51, 57 (1990); *see also Moore v. Nissan Motor Acceptance Corp.,* 376 Md. 558, 831 A.2d 12 (2003). Here, Petitioners paid voluntarily their fines and did not challenge in the District Court, as a means to defeat assessment of the civil penalty, whether the speed monitoring systems were being managed in contravention of § 21–809(j). That Petitioners did not litigate their § 21–809(j) claim in the District Court is not fatal at the threshold, in and of itself, to the present claim. In *Rowland,* the defendant withdrew from a circuit court before it was adjudicated her counterclaim against the plaintiff/veterinarian for professional malpractice; yet, this Court concluded that she could pursue her counterclaim in a subsequent, separate action. 320 Md. at 230, 577 A.2d at 54.

Respondents retort that a defendant may not bring a separate and subsequent action based on a prior counterclaim that

---

**13.** Maryland Rule 2–331(a) provides:

Counterclaim against opposing party. A party may assert as a counterclaim any claim that party has against any opposing party, whether or not arising out of the transaction or occurrence that is the subject matter of the opposing party's claim. A counterclaim may or may not diminish or defeat the recovery sought by the opposing party. It may claim relief exceeding in amount or different in kind from that sought in the pleading of the opposing party.

could have been raised if "[t]he relationship between the counterclaim and the plaintiff's claim is such that successful prosecution of the second action would nullify the initial judgment or would impair rights established in the initial action." *Rowland,* 320 Md. at 232, 577 A.2d at 55 (quoting Restatement (Second) of Judgments § 22(2)(b) (1982)). Whether Petitioners were operating their vehicles ten or more miles per hour over the posted speed limits at the time of their citations and whether Respondents' contracts with ACS contravene § 21–809(j) are related distantly. The factual inquiry surrounding the former question involves principally who was operating the vehicle at the time and whether the speed of the vehicle was captured accurately. *See* Transp. Art., § 21–809(f). The factual inquiry surrounding the latter question (apart from the pure statutory interpretation question) involves whether Respondents operated their speed monitoring systems within the meaning of the statute, and if not, was the means of compensating ACS in conformance with the statute. Thus, Petitioners' § 21–809(j) defense, if successful, would not nullify Respondents' prior admission of speeding, represented by paying the penalty before trial in the District Court. As we stated in *Rowland,* it is one thing to say that a successful assertion of a defense would have defeated the initial action, but quite another to say that a successful prosecution of the defense/counterclaim would serve to nullify an admission of guilt. 320 Md. at 236, 577 A.2d at 57.

B. *Does Transportation Article, § 21–809 Contain an Express* [14] *or Implied Private Cause of Action?*

Although Petitioners did not waive, by paying the civil penalties without contest, their ability to maintain the present complaint, they are not entitled to bring their tort-based counts as a private cause of action under Transportation Article § 21–809. A private cause of action in favor of a particular plaintiff or class of plaintiffs does not exist simply

---

14. This query may be answered succinctly. The relevant statutory scheme does not extend expressly a right of private action to Petitioners or the purported class they represent.

because a claim is framed that a statute was violated and a plaintiff or class of plaintiffs was harmed by it. *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82, 91 (1979) (citing *Cannon v. Univ. of Chi.,* 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560, 570 (1979)). Rather, the issue is a matter of statutory construction. *Id.* (citing *Cannon,* 441 U.S. at 688, 99 S.Ct. at 1953, 60 L.Ed.2d at 570). As such, Petitioners' alternative argument, that tort law, rather than an inquisition into statutory construction, yields an implied cause of action, is unavailing. *Id.* (citing *Cannon,* 441 U.S. at 688, 99 S.Ct. at 1953, 60 L.Ed.2d at 570).

■■■ The U.S. Supreme Court fashioned the prevailing test for determining whether a statute contains implicitly a private cause of action:

> In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose especial benefit the statute was enacted[.]" Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? [15]

*Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087–88, 45 L.Ed.2d 26, 36 (1975) (internal citations omitted). This Court utilized the *Cort* test in *Erie Insurance Company,* 322 Md. at 90–91, 585 A.2d at 237, which dealt with a Maryland statute. In *Erie,* we could not find an implied private cause of action in a Transportation Article statute requiring motor vehicle insurers to notify the Motor Vehicle Administration when insurance

---

**15.** When a court determines whether a federal statute contains a private cause of action, there is a fourth factor not implicated in the present case: "[I]s the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law." *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2088, 45 L.Ed.2d 26, 36–37 (1975) (citing, among other cases, *Wheeldin v. Wheeler,* 373 U.S. 647, 652, 83 S.Ct. 1441, 1445, 10 L.Ed.2d 605, 611 (1963)).

policies lapse or terminate within six months of issuance. *Erie,* 322 Md. at 90–92, 585 A.2d at 237–38.

*Touche Ross* emphasized that "[t]he central inquiry remains whether [the legislative body] intended to create, either expressly or by implication, a private cause of action." 442 U.S. at 575–76, 99 S.Ct. at 2489, 61 L.Ed.2d at 96. Courts discern legislative intent whether a private cause of action was intended by analyzing the language of the statute to identify its purpose and intended beneficiaries, reviewing the statute's legislative history, and determining whether the statute provides otherwise an express remedy. *Touche Ross,* 442 U.S. at 575–76, 99 S.Ct. at 2489, 61 L.Ed.2d at 96; *Scull v. Doctors Groover, Christie & Merritt, P.C.,* 205 Md.App. 567, 45 A.3d 925, 931–32 (2012) (quoting *Sugarloaf Citizens Assoc. v. Gudis,* 78 Md.App. 550, 556, 554 A.2d 434, 437 (1989)). As a result, "[i]n a case in which neither the statute nor the legislative history reveals a [legislative] intent to create a private right of action for the benefit of the plaintiff, we need not carry the *Cort v. Ash* inquiry further." *Nw. Airlines, Inc. v. Transp. Workers Union,* 451 U.S. 77, 95 n. 31, 101 S.Ct. 1571, 1582 n. 31, 67 L.Ed.2d 750, 765 n. 31 (1981) (citing *Univs. Research Assn. v. Coutu,* 450 U.S. 754, 770 n. 21, 101 S.Ct. 1451, 1461 n. 21, 67 L.Ed.2d 662, 675 n. 21 (1981); *Touche Ross,* 442 U.S. at 575–76, 579–80, 99 S.Ct. at 2488–89, 2491, 61 L.Ed.2d at 95–96, 98 (Brennan, J., concurring)); *see also Scull,* 205 Md.App. at 577–82, 45 A.3d at 931–33 (quoting *Sugarloaf,* 78 Md.App. at 556, 554 A.2d at 437).

Thus, our analysis begins with the language of the statute at hand and whether it confers a beneficial right upon a particular class of persons. *Univs. Research Assn.,* 450 U.S. at 771, 101 S.Ct. at 1461, 67 L.Ed.2d at 675 (citing *Transamerica Mortg. Advisors, Inc. v. Lewis,* 444 U.S. 11, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979)); *Touche Ross,* 442 U.S. at 568, 99 S.Ct. at 2485, 61 L.Ed.2d at 91; *Cannon,* 441 U.S. at 689, 99 S.Ct. at 1953, 60 L.Ed.2d at 571. If a statute's language provides a right to a particular class of persons, there is a strong inference that the legislature intended the statute to carry an implied cause of action. *Univs. Research Assn.,* 450 U.S. at

771–72, 101 S.Ct. at 1462, 67 L.Ed.2d at 676 (citing *Cannon,* 441 U.S. at 693 n. 13, 99 S.Ct. at 1955 n. 13, 60 L.Ed.2d at 573 n. 13); *Cal. v. Sierra Club,* 451 U.S. 287, 293–94, 101 S.Ct. 1775, 1779, 68 L.Ed.2d 101, 107–08 (1981); *Scull,* 205 Md.App. at 577, 45 A.3d at 931. Conversely, that inference becomes attenuated when the statute is framed as a "general prohibition or a command" to a governmental entity or other group or confers a generalized benefit. *Univs. Research Assn.,* 450 U.S. at 772, 101 S.Ct. at 1462, 67 L.Ed.2d at 676 (citing *Cannon,* 441 U.S. at 690–92, 99 S.Ct. at 1954–55, 60 L.Ed.2d at 572–73); *Scull,* 205 Md.App. at 577–80, 45 A.3d at 931–32. For example, in *Cannon,* the Supreme Court listed several statutory schemes that conferred a right on a class of persons and created an implied private cause of action: "All citizens of the United States shall have the same right . . . as is enjoyed by white citizens thereof," "no person shall be denied the right to vote," and "[e]mployees shall have the right to organize and bargain collectively." 441 U.S. at 693 n. 13, 99 S.Ct. at 1955 n. 13, 60 L.Ed.2d at 573 n. 13 (citations omitted).

Transportation Article § 21–809(j) is framed as a prohibitive command and does not confer rights on a class of persons [16]:

---

**16.** This conclusion forecloses also Petitioners' alternative argument that their causes of action are based on common law tort duties. A statute creates an enforceable duty " 'when the plaintiff is a member of the class of persons the statute was designed to protect and the injury was of the type the statute was designed to prevent.' Furthermore, the statute must 'set forth mandatory acts clearly for the protection of a particular class of persons rather than the public as a whole.' " *Gourdine v. Crews,* 405 Md. 722, 755, 955 A.2d 769, 789 (2008) (citations omitted) (quoting *Pendleton v. State,* 398 Md. 447, 466–67, 921 A.2d 196, 208 (2007) and *Remsburg v. Montgomery,* 376 Md. 568, 584, 831 A.2d 18, 27 (2003)); *see also Horridge v. St. Mary's Cnty. Dep't of Soc. Servs.,* 382 Md. 170, 187, 854 A.2d 1232, 1241 (2004); *Muthukumarana v. Montgomery Cnty.,* 370 Md. 447, 487, 805 A.2d 372, 396 (2002).

In *Gourdine,* the plaintiff argued that the following language in the federal Food, Drug, and Cosmetic Act created an enforceable duty in the defendant drug manufacturer: " 'The following acts and the causing thereof are prohibited: (a) The introduction or delivery for introduction into interstate commerce of any food, drug, device, or cosmetic that is adulterated or misbranded.' " 405 Md. at 757, 955 A.2d at 790 (quoting 21 U.S.C. § 331(a) (2008)). We disagreed, noting that the statute was "framed to protect the public in general." *Id.* (citing *United States*

"If a contractor operates a speed monitoring system on behalf of Montgomery County, the contractor's fee may not be contingent on the number of citations issued or paid." The statute does not "unmistakably focus" on a particular class of persons who benefit from it. *Sierra Club*, 451 U.S. at 294, 101 S.Ct. at 1779, 68 L.Ed.2d at 108.

The legislative history fails to reveal an intent to benefit a particular class of persons. Instead, the bill file for House Bill 443 (2005) is replete with generalized statements from citizens, advocacy groups, and municipal politicians urging the General Assembly to authorize speed monitoring systems in order to slow down drivers; to protect pedestrians, bicyclists, and transit riders; and to free-up police officers to attend to other matters. Bill file for H.B. 433, 2005 Leg., 420th Sess. (Md. 2005). Even were we to assume that Petitioners are correct that the General Assembly intended the statute to benefit recipients of citations, issued according to speed monitoring systems established pursuant to the statutory scheme, whether it intended also that § 21–809 create an implied private cause of action is a separate issue. *Transamerica*, 444 U.S. at 17–18, 100 S.Ct. at 246, 62 L.Ed.2d at 153; *Touche Ross*, 442 U.S. at 578, 99 S.Ct. at 2490, 61 L.Ed.2d at 97 ("But the mere fact that [a statute] was designed to provide protection for [a

---

*v. Article of Drug Bacto–Unidisk*, 394 U.S. 784, 798, 89 S.Ct. 1410, 1418, 22 L.Ed.2d 726, 797 (1969)). In *Muthukumarana*, a Maryland statute required all counties to have an operational 9–1–1 system to protect the safety and well-being of Marylanders. 370 Md. at 499–500, 805 A.2d at 403. The plaintiff posited that the statute placed on a 9–1–1 operator a duty of care to an injured citizen utilizing that service. *Id.* Again, we disagreed, stating that statutory language requiring "broad" emergency services did not evince a special benefit to a particular class of persons: "In our view, acting to protect or assist a 'specific group of individuals,' sufficient to create a special relationship, involves more than general actions taken to serve members of the public at large in need of emergency telephone services." *Muthukumarana*, 370 Md. at 499, 805 A.2d at 403.

The assertedly relevant portion of the present statute, like the statutes in *Gourdine* and *Muthukumarana*, protects the public in general by prohibiting certain contingency fees, without enumerating a particular class of persons. Therefore, no actionable tort duty inures from § 21–809 to the benefit of Petitioners.

class of persons] does not require the implication of a private damages action in their behalf.").

Next, we look to the purpose of the statute. Section 21–809 creates rules and procedures for Montgomery County (and perhaps its municipalities) to operate a speed monitoring system. It does not provide expressly for a private cause of action, as we noted *supra* in footnote 14. The purpose of the statute also furnishes a remedy for challenging a speed monitoring system citation. Subsections (d), (e) and (f) of § 21–809 lay out a procedure for a citation recipient to demand a trial in the District Court of Maryland (sitting in Montgomery County, presumably) for an alleged violation. In his or her defense, a citation recipient may argue that his or her car or license plates were stolen or "[a]ny other issues and evidence that the District Court deems pertinent." Transp. Art., § 21–809(f)(1).

"'[A]n elemental canon of statutory construction [is] where a statute expressly provides a particular remedy or remedies, a court must be chary of reading others into it.'" *Sugarloaf,* 78 Md.App. at 556, 554 A.2d at 437 (quoting *Transamerica,* 444 U.S. at 19, 100 S.Ct. at 247, 62 L.Ed.2d at 154–55). Under § 21–809(f)(1)(iii), citation recipients, such as Petitioners, may (but are not obliged to) defend against receiving a citation on the basis that the local government violated § 21–809(j).[17],[18] This militates against finding a separate, private cause of action to enforce the statute.

---

**17.** Indeed, Respondents inform us in their brief that a speed monitoring system citation recipient contested her citation in the District Court, sitting in Montgomery County, by arguing that Montgomery County's contract with ACS violated Transportation Article § 21–809(j). She did not prevail in the District Court and appealed to the Circuit Court for Montgomery County. The Circuit Court concluded ultimately that Montgomery County was the operator of its speed monitoring system and affirmed. *State v. St. John,* Criminal No. 112596 (Cir. Ct. Montgomery Cnty. 18 May 2009). Appellate review was not sought.

**18.** Petitioners argue that, even if they cannot sue on an implied private cause of action in tort, the District Court would not have had jurisdiction over their claims for equitable and declaratory relief. *See* Md.Code

Finally, the legislative history of § 21–809 does not reveal a legislative intent to create an implied private cause of action. Of relevance to this factor, the U.S. Supreme Court observed that

> such legislative silence is often encountered in implied-right-of-action cases; it is to be expected that "the legislative history of a statute that does not expressly create or deny a private remedy will typically be equally silent or ambiguous on the question." Therefore, "the failure of Congress expressly to consider a private remedy is not inevitably inconsistent with an intent on its part to make such a remedy available." *But unless this congressional intent can be inferred from the language of the statute, the statutory structure, or some other source, the essential predicate for implication of a private remedy simply does not exist.*

*Nw. Airlines,* 451 U.S. at 94, 101 S.Ct. at 1582, 67 L.Ed.2d at 765 (emphasis added) (internal citations omitted). In the context of this State's legislative process, the Court of Special Appeals in *Scull* opined that the difference in legislative record-keeping between Congress and the General Assembly reduced the persuasiveness of a state law's legislative history. 205 Md.App. at 577–80, 45 A.3d at 931–32 (citing *Sugarloaf,* 78 Md.App. at 558, 554 A.2d at 438). Nonetheless, " 'where the plain language of a provision weighs against implication of a private remedy, silence within the legislative history as to a private cause of action reinforces the decision not to find such a right implicitly.' " *Scull,* 205 Md.App. at 580, 45 A.3d at 932 (quoting *IVTX, Inc. v. United Healthcare of the Mid–Atlantic, Inc.,* 112 F.Supp.2d. 445, 447 (D.Md.2000)).

Thus, the lack of discernible legislative intent to create an implied cause of action in the plain language and structure of the statute, its legislative history, or some other legitimate and

---

(1973, 2006 Repl.Vol., 2011 Cum.Supp.), Cts. & Jud. Proc. Art., § 4–402(a), (c). Such claims, however, are separate from a private cause of action and ordinarily may be pursued independently in the Circuit Court. For the reasons to be explained in terms of the posture of the record in this case, Petitioners' injunctive and declaratory claims for relief are moot.

reliable source cements the conclusion that the Legislature, in enacting § 21–809, did not contemplate an implied private cause of action. Our conclusion is reinforced by the assumption that legislative bodies know how to "salt the mine" for the enablement of implied private causes of action. *Touche Ross,* 442 U.S. at 571–72, 99 S.Ct. at 2487, 61 L.Ed.2d at 93 (citing, among other cases, *Blue Chip Stamps v. Manor Drug Stores,* 421 U.S. 723, 734, 95 S.Ct. 1917, 1925, 44 L.Ed.2d 539, 548 (1975)); *Cannon,* 441 U.S. at 693 n. 14, 697–99, 99 S.Ct. at 1955 n. 14, 1958, 60 L.Ed.2d at 573 n. 14, 575–76 (stating that "[i]t is always appropriate to assume that our elected representatives, like other citizens, know the law . . . .").

### C. *Petitioners' Declaratory and Injunctive Relief Claims*

As noted *supra* in footnote 18, Petitioners' declaratory and injunctive relief claims regarding § 21–809 may stand on different footing (theoretically) than their tort claims. Respondents amended their contracts with ACS to make plain (ostensibly) that they, and not ACS, operate their speed monitoring systems. The Court of Special Appeals, in light of these amendments, concluded that Petitioners' declaratory and injunctive relief claims were moot: "We discern, however, no basis to look beyond the plain, unambiguous language of the contracts, which specifically provides that [Respondents] and not ACS are operators of the speed cameras in Montgomery County. Based on the amendments, we conclude that there is no longer an existing controversy between the parties . . . ." *Baker,* 201 Md.App. at 681, 30 A.3d at 291 (internal citations omitted). We are somewhat dubious whether an arguably self-serving, *ipse dixit* contract amendment moots Petitioners' claims necessarily, especially where Respondents admitted during oral argument before this Court that the amendments did not affect substantially or functionally how they and ACS handled the speed monitoring systems before the amendments. *See Owens–Illinois, Inc. v. Cook,* 386 Md. 468, 496, 872 A.2d 969, 985 (2005) (" '[T]he true test of what is meant is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the

parties would have thought it meant.'" (quoting *Gen. Motors Corp. v. Daniels*, 303 Md. 254, 261, 492 A.2d 1306, 1310 (1985))).

■ In any event, Petitioners do not have standing to pursue declaratory and injunctive relief on this record. Petitioners maintained steadfastly, albeit quixotically, in the Court of Special Appeals that they were not asserting standing as taxpayers, relying instead solely on their claimed private cause of action theory. *Baker*, 201 Md.App. at 679 n. 27, 30 A.3d at 289 n. 27. Petitioners acknowledged also that some of them are neither Maryland residents nor Maryland taxpayers. "A taxpayer may invoke the aid of a court of equity to restrain the action of a public official or an administrative agency when such action is illegal or ultra vires, and may injuriously affect the taxpayer's rights and property." *Citizens Planning & Hous. Ass'n v. Cnty. Exec. of Balt. Cnty.*, 273 Md. 333, 339, 329 A.2d 681, 684 (1974) (citing, among other cases, *Reed v. McKeldin*, 207 Md. 553, 558, 115 A.2d 281, 284 (1955)). Moreover, Petitioners conceded at oral argument before the Court of Special Appeals that they cannot pursue their declaratory and injunctive relief claims unless a private cause of action exists under § 21–809. In the face of these concessions and our opinion as to the private cause of action issue, we conclude that Petitioners have no basis to obtain equitable or declaratory relief.[19]

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED; PETITIONERS TO PAY COSTS IN THIS COURT AND THE COURT OF SPECIAL APPEALS.**

---

**19.** As a result, we do not decide whether Petitioners had standing, on a basis other than an implied private cause of action under Transportation Article § 21–809, to seek a declaration that Respondents' contracts with ACS violate § 21–809(j) or to an injunction against Respondents' enforcement of their speed monitoring systems.